# EXHIBIT A

10-Q 1 v225979_10q.htm 10-Q

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON D.C. 20549**

**FORM 10-Q**

☒   **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**FOR THE QUARTERLY PERIOD ENDED JUNE 30, 2011**

**OR**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**FOR THE TRANSITION PERIOD FROM        TO        .**

**COMMISSION FILE NUMBER: 0-50295**

**ADVANCED CELL TECHNOLOGY, INC.**
(EXACT NAME OF REGISTRANT AS SPECIFIED IN ITS CHARTER)

**DELAWARE**                                    **87-0656515**
(STATE OR OTHER JURISDICTION OF          (I.R.S. EMPLOYER IDENTIFICATION NO.)
INCORPORATION OR ORGANIZATION)

**33 LOCKE DRIVE, MARLBOROUGH, MASSACHUSETTS 01752**
(ADDRESS, INCLUDING ZIP CODE, OF PRINCIPAL EXECUTIVE OFFICES)

REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE: **(508) 756-1212**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒  No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☐ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer," and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐          Accelerated filer ☒          Non-accelerated filer ☐          Smaller reporting company ☐
                                                             (Do not check if a smaller
                                                             reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).
Yes ☐  No ☒

        Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.

Filed 8/4/11

| Class: | Outstanding at July 29, 2011: |
| --- | --- |
| Common Stock, $0.001 par value per share | 1,590,808,502 shares |

<u>Item 1. Financial Statements</u>

**ADVANCED CELL TECHNOLOGY, INC. AND SUBSIDIARY**
**CONSOLIDATED BALANCE SHEETS**
**AS OF JUNE 30, 2011 AND DECEMBER 31, 2010**

| | June 30, 2011 | December 31, 2010 |
|---|---|---|
| | (unaudited) | |
| **ASSETS** | | |
| **CURRENT ASSETS:** | | |
| Cash and cash equivalents | $ 16,114,324 | $ 15,889,409 |
| Deferred royalty fees, current portion | 77,017 | 91,598 |
| Prepaid expenses | 344,497 | - |
| Total current assets | 16,535,838 | 15,981,007 |
| Property and equipment, net | 183,538 | 185,102 |
| Deferred royalty fees, less current portion | 263,870 | 295,089 |
| Deposits | 14,766 | 14,766 |
| Deferred issuance costs | 1,782,648 | 2,578,188 |
| **TOTAL ASSETS** | $ 18,780,660 | $ 19,054,152 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| **CURRENT LIABILITIES:** | | |
| Accounts payable | $ 1,925,861 | $ 1,982,743 |
| Accrued expenses | 1,610,230 | 4,971,304 |
| Accrued settlement | - | 3,205,856 |
| Deferred revenue, current portion | 310,412 | 506,418 |
| 2009 Convertible promissory notes, current portion, net of discounts of $0 and $19,229, respectively | - | 132,680 |
| Embedded conversion option liabilities, current portion | - | 537,249 |
| Deferred joint venture obligations, current portion | 1,853 | 6,870 |
| Total current liabilities | 3,848,356 | 11,343,120 |
| Convertible promissory notes, less current portion, net of discounts of $222,095 and $285,005, respectively | 65,690 | 2,780 |
| Embedded conversion option liabilities, less current portion | 598,229 | 482,686 |
| Warrant and option derivative liabilities | 16,931,286 | 27,307,218 |
| Deferred revenue, less current portion | 2,187,627 | 2,298,997 |
| Total liabilities | 23,631,188 | 41,434,801 |
| Series A-1 redeemable preferred stock, $0.001 par value; 50,000,000 shares authorized, 113 and 113 shares issued and outstanding; aggregate liquidation value, net of discounts: $1,408,958 and $1,349,657, respectively | 1,348,642 | 1,272,441 |
| Commitments and contingencies | | |
| **STOCKHOLDERS' DEFICIT:** | | |
| Preferred stock, Series B; $0.001 par value; 50,000,000 shares authorized, 1,000 shares issued and outstanding | 1 | 1 |
| Preferred stock, Series C; $0.001 par value; 50,000,000 shares authorized, 800 and 400 shares issued and outstanding at June 30, 2011 and December 31, 2010, respectively | 1 | - |
| Common stock, $0.001 par value; 1,750,000,000 shares authorized, 1,588,670,748 and 1,439,826,362 shares issued and outstanding at June 30, 2011 and December 31, 2010, respectively | 1,588,671 | 1,439,826 |
| Additional paid-in capital | 200,370,360 | 166,033,976 |

10Q Filed 8/4/11

| | | |
|---|---:|---:|
| Promissory notes receivable and accrued interest, net of discount of $4,282,786 and | | |
| $3,322,630, respectively | (18,978,857) | (10,177,370) |
| Accumulated deficit | (189,179,346) | (180,949,523) |
| Total stockholders' deficit | (6,199,170) | (23,653,090) |
| **TOTAL LIABILITIES AND STOCKHOLDERS' DEFICIT** | $ 18,780,660 | $ 19,054,152 |

The accompanying notes are an integral part of these consolidated financial statements.

3

# EXHIBIT B

424B3 1 v233690_424b3.htm 424B3

Filed pursuant to Rule 424(b)(3)
Under the Securities Act of 1933, as amended
Registration No. 333-163202

## ADVANCED CELL TECHNOLOGY, INC.
11,551,820 Shares of Common Stock

### PROSPECTUS

This prospectus relates to the public offering of up to 11,551,820 shares of common stock, par value $.001 per share, of Advanced Cell Technology, Inc. ("Common Stock"), by the selling stockholders.

The selling stockholders may sell Common Stock from time to time in the principal market on which the stock is traded at the prevailing market price or in negotiated transactions.

We will not receive any of the proceeds from the sale of Common Stock by the selling stockholders. We will pay the expenses of registering these shares.

**Investment in the Common Stock involves a high degree of risk. You should consider carefully the risk factors beginning on page 8 of this prospectus before purchasing any of the shares offered by this prospectus.**

Our common stock is quoted on the Over-the-Counter Bulletin Board and trades under the symbol "ACTC". The last reported sale price of our common stock on the Over-the-Counter Bulletin Board on August 10, 2011, was approximately $0.162 per share.

**We may amend or supplement this prospectus from time to time by filing amendments or supplements as required. You should read the entire prospectus and any amendments or supplements carefully before you make your investment decision.**

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

The date of this prospectus is August 25, 2011.

2

Filed 8/29/11

## ADVANCED CELL TECHNOLOGY, INC.

### TABLE OF CONTENTS

|  | Page |
|---|---|
| Prospectus Summary | 4 |
| Risk Factors | 8 |
| Use of Proceeds | 27 |
| Forward-Looking Statements | 27 |
| Selling Security Holders | 28 |
| Plan of Distribution | 29 |
| Description of Securities to be Registered | 30 |
| Interests of Named Experts and Counsel | 31 |
| Description of Business | 31 |
| Description of Property | 42 |
| Legal Proceedings | 43 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 44 |
| Market Price of and Dividends on Registrant's Common Equity and Related Stockholder Matters | 56 |
| Directors, Executive Officers, Promoters and Control Persons | 59 |
| Changes in Accountants | 59 |
| Executive Compensation | 60 |
| Security Ownership of Certain Beneficial Owners and Management | 65 |
| Certain Relationships and Related Transactions, and Corporate Governance | 65 |
| Additional Information | 66 |
| Indemnification for Securities Act Liabilities | 66 |
| Legal Matters | 67 |
| Experts | 67 |
| Unaudited Financial Statements | F-1 |
| Audited Financial Statements | F-22 |

You may only rely on the information contained in this prospectus or that we have referred you to. We have not authorized anyone to provide you with different information. This prospectus does not constitute an offer to sell or a solicitation of an offer to buy any securities other than the common stock offered by this prospectus. This prospectus does not constitute an offer to sell or a solicitation of an offer to buy any common stock in any circumstances in which such offer or solicitation is unlawful. Neither the delivery of this prospectus nor any sale made in connection with this prospectus shall, under any circumstances, create any implication that there has been no change in our affairs since the date of this prospectus or that the information contained by reference to this prospectus is correct as of any time after its date.

3

424B3 1 v233688_424b3.htm 424B3

Filed pursuant to Rule 424(b)(3)
Under the Securities Act of 1933, as amended
Registration No. 333-162435

## ADVANCED CELL TECHNOLOGY, INC.
72,135,892 Shares of Common Stock

### PROSPECTUS

This prospectus relates to the public offering of up to 72,135,892 shares of common stock, par value $.001 per share, of Advanced Cell Technology, Inc. ("Common Stock"), by the selling stockholders.

The selling stockholders may sell Common Stock from time to time in the principal market on which the stock is traded at the prevailing market price or in negotiated transactions.

We will not receive any of the proceeds from the sale of Common Stock by the selling stockholders. We will pay the expenses of registering these shares.

**Investment in the Common Stock involves a high degree of risk. You should consider carefully the risk factors beginning on page 9 of this prospectus before purchasing any of the shares offered by this prospectus.**

Our common stock is quoted on the Over-the-Counter Bulletin Board and trades under the symbol "ACTC". The last reported sale price of our common stock on the Over-the-Counter Bulletin Board on August 10, 2011, was approximately $0.162 per share.

**We may amend or supplement this prospectus from time to time by filing amendments or supplements as required. You should read the entire prospectus and any amendments or supplements carefully before you make your investment decision.**

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

**The date of this prospectus is August 25, 2011.**

3

Filed 8/29/11

ADVANCED CELL TECHNOLOGY, INC.

## TABLE OF CONTENTS

| | Page |
|---|---|
| Prospectus Summary | 5 |
| Risk Factors | 9 |
| Use of Proceeds | 28 |
| Forward-Looking Statements | 28 |
| Selling Security Holders | 29 |
| Plan of Distribution | 30 |
| Description of Securities to be Registered | 31 |
| Interests of Named Experts and Counsel | |
| Description of Business | 32 |
| Description of Property | 43 |
| Legal Proceedings | 44 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 45 |
| Market Price of and Dividends on Registrant's Common Equity and Related Stockholder Matters | 57 |
| Directors, Executive Officers, Promoters and Control Persons | 60 |
| Changes in Accountants | |
| Executive Compensation | 61 |
| Security Ownership of Certain Beneficial Owners and Management | 66 |
| Certain Relationships and Related Transactions, and Corporate Governance | 66 |
| Additional Information | 67 |
| Indemnification for Securities Act Liabilities | 67 |
| Legal Matters | 68 |
| Experts | 68 |
| Unaudited Financial Statements | F-1 |
| Audited Financial Statements | F-22 |

You may only rely on the information contained in this prospectus or that we have referred you to. We have not authorized anyone to provide you with different information. This prospectus does not constitute an offer to sell or a solicitation of an offer to buy any securities other than the common stock offered by this prospectus. This prospectus does not constitute an offer to sell or a solicitation of an offer to buy any common stock in any circumstances in which such offer or solicitation is unlawful. Neither the delivery of this prospectus nor any sale made in connection with this prospectus shall, under any circumstances, create any implication that there has been no change in our affairs since the date of this prospectus or that the information contained by reference to this prospectus is correct as of any time after its date.

# EXHIBIT C

1173339-1

.

EX-10.1 2 v232624_ex10-1.htm EXHIBIT 10.1
### SETTLEMENT AGREEMENT AND MUTUAL RELEASE

WHEREAS, Midsummer Investment, Ltd. and Midsummer Small Cap Master, Ltd. (collectively, "Midsummer") hold Warrants issued by Advanced Cell Technology, Inc. ("Advanced Cell") dated August 30, 2006, August 31, 2007, August 31, 2007 and March 31, 2008 to purchase 218,761 shares, 871,527 shares, 5,536,765 shares and 3,346,667 shares respectively, which upon final adjustment on July 29, 2009 entitled the holder to purchase an aggregate of 19,027,991 shares to Advanced Cell common stock, and Warrants Nos. 2009-A-008-1 and 2010-A-008-1 entitling the holder to purchase an aggregate of 1,291,740 shares of Advanced Cell common stock respectively, in all cases subject to adjustments (all such Warrants being referred to herein as the "Warrants"); and

WHEREAS, Advanced Cell and Midsummer have been unable to agree upon the proper adjusted number of shares of common stock to be issued upon exercise of the Warrants; and

WHEREAS, the parties are now desirous of resolving their differences;

IT IS HEREBY AGREED, by and between the parties hereto, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, as of the 9th day of August 2011, as follows:

1.      Upon execution of this Settlement Agreement and upon tender by Midsummer to Advanced Cell of all of the Warrants together with duly executed Notices of Exercise:

A.       Advanced Cell shall (i) deliver to Midsummer an aggregate of 36,000,000 shares (subject to adjustment for reverse and forward stock splits, stock dividends, reclassifications and the like) of Advanced Cell common stock (the "Current Shares"), issuable upon surrender of the Warrants as a cashless exercise of the Warrants in respect of a partial exercise of Warrants, (ii) shall undertake to issue 30,585,774 additional shares (subject to adjustment for reverse and forward stock splits, stock dividends, reclassifications and the like) of Advanced Cell common stock (the "Future Shares"), as a cashless exercise of the remainder of the Warrants within ten days of the date that Advanced Cell shall have sufficient authorized and unissued shares of Common Stock ("Authorized Share Increase") which are not otherwise reserved for issuance for other purposes to enable Advanced Cell to issue all of the Future Shares and (iii) shall issue 3,058,577 shares (subject to adjustment for reverse and forward stock splits, stock dividends, reclassifications and the like) of Advanced cell common stock (the "Additional Future Shares") for every calendar month elapsed between the date of delivery of the Current Shares and the date following delivery of the Future Shares pursuant to the term of this Agreement. Advanced Cell shall seek the Authorized Share Increase as soon as reasonably practical, and in any event within 12 months after the date hereof. Upon obtaining the Authorized Share Increase, Advanced Cell shall reserve a sufficient number of shares thereunder in order to issue all of the Future Shares and Additional Future Shares issuable hereunder. Of such shares, the Future Shares are issued in respect of the exercise of the entire unexercised portion of the Warrants and the Additional Future Shares are issued in respect of the delay from the date hereof until the date such Future Shares are freely tradable. This Agreement hereby constitutes a cashless exercise by Midsummer of the Warrants as in effect on the date hereof, and Advanced Cell agrees that no further notices or actions by Midsummer are required. The Company represents and warrants that all the Current Shares and the Future Shares, when issued, will be freely tradable and without restriction pursuant to Rule 144, as in effect on the date hereof. All the Current Shares and Future Shares shall be electronically delivered to the following accounts of · Midsummer (81.5% to Midsummer Investment, Ltd. and 18.5% to Midsummer Small Cap Master, Ltd. unless otherwise notified in writing by Midsummer) by DWAC within 48 hours following the execution of this Agreement by all of the parties hereto, in the case of the Current Shares, and within the time period required hereunder, in the case of the Future Shares:

-2-

DTC:

**Midsummer Small Cap Master, Ltd.**
| | |
|---|---|
| DTC Clearing Number | 0418 |
| Institutional ID Number | 94129 |
| Agent ID Number | 94129 |
| Account Number | 522-9580V |
| Account Name | Citigroup Global Markets Inc Prime Broker FAO |
| | Midsummer Small Cap Master, Ltd. |

**Midsummer Investment Ltd.**
| | |
|---|---|
| DTC Clearing Number | 0418 |
| Institutional ID Number | 94129 |
| Agent ID Number | 94129 |
| Account Number | 522-95784 |
| Account Name | Citigroup Global Markets Inc Prime Broker FAO |
| | Midsummer Investment, Ltd. |

Such delivery of the Current Shares shall be a condition subsequent to this Agreement taking effect, such that if such Current Shares are not timely delivered this Agreement shall become null and void as if it were never entered into.

B.      Except for this Agreement, all other agreements between the parties hereto, including any agreements between Advanced Cell and any entity controlled by Midsummer or its principals are hereby deemed cancelled, null and void, and of no force or effect.

-3-

2.      Midsummer represents and warrants that except for the right to receive the Current Shares, the Future Shares and the Additional Future Shares hereunder, neither it, nor any of its Affiliates (as such term is defined in Rule 4.05 of the 1933 Act hold Warrants, promissory notes, derivative securities or other instruments of any kind entitling them to the delivery of shares or money from Advanced Cell. Midsummer further represents and warrants that it (a) is acquiring the Additional Future Shares for its own account, for investment and not with a view to the distribution thereof within the meaning of the 1933 Act of 1933, and the rules and regulations promulgated thereunder; (b) understands that the Additional Future Shares have not been registered under the 1933 Act and must be held by Midsummer indefinitely unless a subsequent disposition thereof is registered under the 1933 Act or is exempt from registration; and (c) is an "accredited investor" as defined in Rule 501(a) under the 1933 Act, and by reason of its business and financial experience, and the business and financial experience of those persons retained by it to advise it with respect to its purchase of the Additional Future Shares, has such knowledge, sophistication and experience in business and financial matters so as to be capable of evaluating the merits and risks of the prospective investment, is able to bear the economic risk of such investment and, at the present time, is able to afford a complete loss of such investment.

3.      Advanced Cell represents and warrants that this Agreement is a binding corporate obligation duly approved by its Board of Directors, or appropriate corporate officers and that it has not and will not, directly or indirectly, provide Midsummer, its agents or counsel with any information that Advanced Cell believes constitutes material non-public information. Advanced Cell understands and confirms that each Purchaser shall be relying on the foregoing covenant in effecting the sale of the Current Shares and Future Shares.

-4-

**4.** Midsummer agrees that until the earlier of (i) July 1, 2016 or (ii) the date on which all Common Stock Equivalents (as defined below) outstanding on the date hereof shall no longer be outstanding, neither Midsummer nor any Affiliate thereof will, without the prior written consent of Advanced Cell:

(a)     acquire, offer to acquire, or agree to acquire, or encourage or suggest to any third party that they acquire, offer to acquire, or agree to acquire, directly or indirectly, by purchase or otherwise securities of Advanced Cell which would entitle the holder thereof to acquire at any time common stock of Advanced Cell, including, without limitation, any debt, preferred stock, right, option, warrant or other instrument that is at any time convertible into or exercisable or exchangeable for, or otherwise entitles the holder thereof to receive, such common stock ("Common Stock Equivalent") (provided that this provision shall not be deemed to prohibit open market transactions (whether long or short) of common stock of Advanced Cell by Midsummer or its Affiliates);

(b)     make any public announcement with respect to any matter described in subparagraph (a) above; or

(b)     form, join or in any way participate in a "group" as defined in Section 13(d)(3) of the Securities Exchange Act of 1934, as amended (the "1934 Act"), in connection with any of the foregoing.

-5-

5.      **Publicity, Confidentiality**. The parties shall and shall cause their respective Affiliates to, hold the terms of this Settlement Agreement and Mutual Release in strictest confidence except as set forth below. Notwithstanding any provisions of this Agreement to the contrary, no provision of this Agreement shall prohibit any party from (a) filing any documents or making any disclosures required by the 1933 Act, the 1934 Act or the rules and regulations of the Securities and Exchange Commission (the "SEC"), applicable state securities agencies or upon advice of counsel rendered to Advanced Cell in good faith or making any other public disclosure required by the federal or state securities law, *provided that* the content of any document so filed does not violate any of the other terms and conditions of this Agreement unless such content constitutes disclosure required by any securities laws or rules or regulations promulgated from time to time by the SEC or applicable state securities agencies, (b) filing any documents or disclosing any information required to be filed or disclosed pursuant to the Internal Revenue Code of 1986, as amended, the rules and regulations thereunder, any applicable state or local tax code, or the rules and regulations under such state or local code, (c) responding to any legal subpoena or other judicially enforceable written request from any court or governmental agency of competent jurisdiction and testifying truthfully pursuant to such subpoena or other request, (d) enforcing any rights of such party under this Agreement, or (e) communication with counsel, accountants, auditors, brokers, consultants, advisors and other service providers who have a reasonable need to know the contents of this Agreement.

In the event that a party is required by law, rule, regulation, legal, judicial or regulatory proceeding, governmental or similar authority or by the rules of any recognized stock exchange or self-regulatory agency to disclose any information relating to this Settlement Agreement and Mutual Release, such party agrees that it shall promptly notify the other party in writing of the existence, terms and circumstances of any such request or requirement (unless such notice is prohibited by law, rule, regulation or the body, if any, making the request) so that the non-disclosing party may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Agreement.

Advanced Cell shall publicly disclose the material terms of this Agreement in either a Current Report on Form 8-K or on its Quarterly Report on Form 10-Q on or before August 15, 2011.

-6-

**6.**     **Advanced Cell's Release**.  Advanced Cell hereby irrevocably, fully, and finally, without further word, deed, action, execution, or further documentation, releases and discharges Midsummer, their past and present officers, directors, employees, managers, heirs and representatives ("Midsummer Releasees"), from any and all actions, causes of action, suits, debts, accounts, covenants, contracts, agreements, promises, damages, judgments, claims, and demands whatsoever, in law or equity, known or unknown which it, its successors and assigns now have or hereinafter may have against Midsummer Releasees, from the beginning of time up to and including the date of this Agreement, PROVIDED, HOWEVER, that nothing in this release shall limit or affect Advanced Cell's rights to enforce this Agreement.

**7.**     **Midsummer's Release**.  Midsummer hereby irrevocably, fully, and finally, without further word, deed, action, execution, or further documentation, release and discharge Advanced Cell and its past and present officers, directors, employees, managers, heirs, and representatives ("Advanced Cell's Releasees"), from any and all actions, causes of action, suits, debts, accounts, covenants, contracts, agreements, promises, damages, judgments, claims, and demands whatsoever, in law or equity, known or unknown which they, their successors and assigns now have or hereinafter may have against the Advanced Cell's Releasees, from the beginning of time up to and including the date of this Agreement, including all claims in respect of derivative securities relating to issuances of Company securities prior to the date hereof irrespective of the price, if any, at which such securities were issued, PROVIDED, HOWEVER, that nothing in this release shall limit or affect Midsummer's rights to enforce this Agreement or their rights to the Current Shares and Future Shares.

-7-

**8.**     **Waiver of Rights Under California Civil Code § 1542.**  Each of the Parties hereby expressly acknowledges that he or it is familiar with the provisions of Section 1542 of the California Civil code, which provides as follows:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if know by him or her must have materially affected his or her settlement with the debtor.

BEING AWARE OF THIS STATUTE, EACH OF THE PARTIES TO THIS AGREEMENT HEREBY EXPRESSLY AND KNOWINGLY WAIVES AND RELINQUISHES ANY RIGHTS HE OR IT MAY HAVE UNDER THIS STATUTE, AS WELL AS UNDER ANY OTHER STATUTE OR PRINCIPAL OF LAW OR EQUITY OF THE SAME OR SIMILAR EFFECT IN FORCE ANYWHERE IN THE WORLD, WITH REGARD TO THE RELEASES SET FORTH IN THIS AGREEMENT, AND HEREBY AGREES THAT NO SUCH STATUTE OR PRINCIPLE OF LAW OR EQUITY IN FORCE ANYWHERE IN THE WORLD, INCLUDING SECTION 1542 OF THE CALIFORNIA CIVIL CODE, SHALL AFFECT THE VALIDITY OR SCOPE OR ANY OTHER ASPECT OF THE RELEASES SET FORTH IN THIS AGREEMENT.

**9.**     **Attorney Advice.**  Each of the Parties Warrants and represent that in executing this Agreement, such Party has relied on legal advice from the attorney of its choice, that the terms of this Settlement Agreement and Mutual Release and its consequences have been completely read and explained to such Party by that attorney, and that such Party fully understands the terms of this Agreement.

**10.**     **No Representations.**  Each of the Parties acknowledge and represent that, in executing this Agreement, such Party has not relied on any inducements, promises, or representations made by any Party or any party representing or serving such Party, unless expressly set forth in a written agreement.

-8-

11.    **Disputed Claim**. This Agreement pertains to a disputed claim and does not constitute an admission of liability or wrongdoing by any Party for any purpose.

12.    **Assignment**. The Parties represent and warrant that it/they are the sole and lawful owner of all right, title and interest in and to every claim and other matter which each purports to release herein, and that it has not heretofore assigned or transferred, or purported to assign or transfer, to any person, firm, association, corporation or other entity, any right, title or interest in any such claim or other matter. In the event that such representation is false, and any such claim or matter is asserted against any party hereto (and/or the successor of such party) by any party or entity who is the assignee or transferee of such claim or matter, the Party shall fully indemnify, defend and hold harmless the party against who such claim or matter is asserted (and its successors) from and against such claim or matter and from all actual costs, demands, fees, expenses, liabilities, and damages which that party (and/or its successors) incurs as a result of the assertion of such claim or matter. It is the intention of the Parties that this indemnity does not require payment as a condition precedent to recovery by a party under this indemnity.

13.    **Authority to Bind Parties**. Each party executing this Agreement represents and warrants to the other parties that the individual executing this Agreement on behalf of each party has the power and authority to execute this Agreement and to bind the party to the terms and conditions of this Agreement by executing this Agreement.

14.    **Survival of Warranties**. The representations and warranties contained in this Agreement are deemed to and do survive the execution hereof.

-9-

**15.**     Modifications. This Agreement may not be amended, canceled, revoked or otherwise modified except by written agreement subscribed by all of the parties to be charged with such modification.

**16.**     Agreement Binding on Successors. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective partners, employees, agents, servants, heirs, administrators, executors, successors, representatives and assigns. The parties agree to execute all documents necessary to effectuate this transaction.

**17.**     Attorney's Fees. All parties hereto agree to pay their own costs and attorneys' fees except as follows:

A.     In the event of any action, suit or other proceeding instituted to remedy, prevent or obtain relief from a breach of this Agreement, arising out of a breach of this Agreement, or pertaining to a declaration of rights under this Agreement, the prevailing party shall recover all of such party's attorneys' fees and costs incurred in each and every such action, suit or other proceeding, including any and all appeals or petitions therefrom. It being agreed and understood that no right is granted hereby to recover any fees or costs for any legal actions taken prior to the date of this Agreement.

B.     As used herein, attorneys' fees shall be deemed to mean the full and actual costs of any legal services actually performed in connection with the matters involved, calculated on the basis of the usual fee charged by the attorneys performing such services.

**18.**     Notices. All notices shall be sent by overnight courier and by e-mail to the addresses designated below and shall be deemed received on the date of transmission.

-10-

| If to Advanced Cell: | Mr. Gary Rabin |
| | Interim CEO |
| | Advanced Cell Technology, Inc. |
| | 1510 11th Street |
| | Santa Monica, CA 290401 |
| | (310) 756-1212 |
| | grabin@advancedcell.com |

| with a copy to: | Thomas D. Washburne, Jr. |
| | Venable LLP |
| | 750 E. Pratt Street, Suite 900 |
| | Baltimore, MD 21202 |
| | (410) 244-7744 |
| | twashburne@venable.com |

| If to Midsummer: | Alan Benaim |
| | Midsummer Capital |
| | 295 Madison Avenue, 38th floor, |
| | New York, NY 10017 |
| | (212) 624 5036 |
| | ab@midsummercapital.com |

| with a copy to: | Robert Charron |
| | Ellenoff Grossman & Schole LLP |
| | 150 East 42nd Street |
| | New York, New York 10170-0002 |
| | Direct: (212) 931-8704 |
| | Facsimile: (212) 401 4741 |
| | rcharron@egsllp.com |

19.    **Governing Law; Forum.** This Agreement shall be governed by the laws of the State of California, without regard to its conflicts of laws principles. All parties consent to the exclusive jurisdiction of the federal or state courts located in Los Angeles, California in connection with any dispute relating to this Agreement and agree that any lawsuits or actions relating to such disputes shall be commenced and maintained exclusively in the state or federal courts located in Los Angeles, California; all parties further agree to accept service of process by overnight courier in any such suit, to waive any defense based upon an inconvenient forum, and to waive any right to a trial by jury.

-11-

**20.**     **Severability.**  Should any provision of this Agreement be declared or be determined by any court of competent jurisdiction or tribunal to be illegal or invalid, the validity of the remaining parts, terms or provisions shall not be effected thereby and said illegal or invalid part, term or provision shall be severed and deemed not to be a part of this Agreement.

**21.**     **Counterparts and Facsimile Execution.**  This Agreement may be executed in one or more counterparts or by facsimile, each of which when executed and delivered shall be an original, and all of which when executed shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties hereto, agreeing to be bound hereby, execute this Agreement upon the date first set forth above.

MIDSUMMER INVESTMENT, LTD.

By:  /s/ Alan Benaim
    Name: Alan Benaim
    Title: Authorized Signatory

MIDSUMMER SMALL CAP MASTER, LTD.

By:  /s/ Alan Benaim
    Name: Alan Benaim
    Title: Authorized Signatory

ADVANCED CELL TECHNOLOGY, INC.

By:  /s/ Gary Rabin
    Name: Gary Rabin
    Title: Chief Executive Officer

-12-

# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BLACK MOUNTAIN EQUITIES, INC.,<br><br>Plaintiff,<br><br>-against-<br><br>ADVANCED CELL TECHNOLOGY, INC.,<br><br>Defendant. | Docket No. 11 Civ. 07305 (PAE)<br><br>PLAINTIFF'S FIRST<br>INTERROGATORY TO DEFENDANT |

Pursuant to Federal Rule of Civil Procedure 33, Plaintiff Black Mountain Equities, Inc.

("BME"), by and through its undersigned counsel, respectfully requests that Defendant

Advanced Cell Technology, Inc. ("ACTC") answer fully, in writing and under oath, the

following interrogatory, within thirty (30) days from the date of service hereof or as sooner

ordered by the Court.

1.      List each sale or issuance of ACTC securities, including stock issued upon any

conversion or exercise of any convertible securities or warrants, since July 29, 2009, and the

price at which such securities were sold or issued and the price at which they can be converted or

exercised.

Dated: New York, New York
          October 27, 2011

OLSHAN GRUNDMAN FROME
ROSENZWEIG & WOLOSKY LLP

By:

Thomas J. Fleming
Jennifer L. Heil
*Attorneys for Plaintiff Black Mountain*
*Enterprises, Inc.*
Park Avenue Tower
65 East 55th Street
New York, New York 10022
(212) 451-2300

1452240-1

# EXHIBIT E

NEITHER THIS SECURITY NOR THE SECURITIES INTO WHICH THIS SECURITY IS EXERCISABLE HAVE BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS AS EVIDENCED BY A LEGAL OPINION OF COUNSEL TO THE TRANSFEROR TO SUCH EFFECT, THE SUBSTANCE OF WHICH SHALL BE REASONABLY ACCEPTABLE TO THE COMPANY. THIS SECURITY AND THE SECURITIES ISSUABLE UPON EXERCISE OF THIS SECURITY MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN SECURED BY SUCH SECURITIES.

## AMENDED AND RESTATED COMMON STOCK PURCHASE WARRANT

Original Issue Date: July 29, 2009
Assignment Date: August 29, 2011

To Purchase 4,000,000 Shares of Common Stock of

### ADVANCED CELL TECHNOLOGY, INC.

THIS AMENDED AND RESTATED COMMON STOCK PURCHASE WARRANT (the "Warrant") certifies that, for value received, Black Mountain Equities, Inc. (the "Holder"), is entitled, upon the terms and subject to the limitations on exercise and the conditions hereinafter set forth, at any time on or after the Original Issue Date hereof (the "Initial Exercise Date") and on or prior to the close of business on June 30, 2014 (the "Termination Date") but not thereafter, to subscribe for and purchase from Advanced Cell Technology, Inc., a Delaware corporation (the "Company"), up to 4,000,000 shares (the "Warrant Shares") of Common Stock, par value $0.001 per share, of the Company (the "Common Stock"). The purchase price of one share of Common Stock under this Warrant shall be equal to the Exercise Price, as defined in Section 2(b).

Section 1.      Definitions. Capitalized terms used and not otherwise defined herein shall have the meanings set forth in that certain Securities Purchase Agreement (the "Purchase Agreement"), dated August 30, 2006, among the Company and the purchasers signatory thereto.

Section 2.      Exercise.

a)      Exercise of Warrant. Exercise of the purchase rights represented by this Warrant may be made, in whole or in part, at any time or times on or after the Initial Exercise Date and on or before the Termination Date by delivery to the Company of a duly executed facsimile copy of the Notice of Exercise Form annexed hereto (or such other office or agency of the Company as it may designate by notice in writing to the registered Holder at the address of such Holder appearing on the books of the Company);provided, however, within 5 Trading Days of the date said Notice of Exercise is delivered to the Company, if this Warrant is exercised in full, the Holder shall have surrendered this Warrant to the Company and the Company shall have received payment of the aggregate Exercise Price of the shares thereby purchased by wire transfer or cashier's check drawn on a United States bank. Notwithstanding anything herein to the contrary, the Holder shall not be required to physically surrender this Warrant to the Company until the Holder has purchased all of the Warrant Shares available hereunder and the Warrant has been exercised in full. Partial exercises of this Warrant resulting in purchases of a portion of the total number of Warrant Shares available hereunder shall have the effect of lowering the outstanding number of Warrant Shares purchasable hereunder in an amount equal to the applicable number of Warrant Shares

purchased. The Holder and the Company shall maintain records showing the number of Warrant Shares purchased and the date of such purchases. The Company shall deliver any objection to any Notice of Exercise Form within 1 Business Day of receipt of such notice. In the event of any dispute or discrepancy, the records of the Holder shall be controlling and determinative in the absence of manifest error. The Holder and any assignee, by acceptance of this Warrant, acknowledge and agree that, by reason of the provisions of this paragraph, following the purchase of a portion of the Warrant Shares hereunder, the number of Warrant Shares available for purchase hereunder at any given time may be less than the amount stated on the face hereof.

b)      Exercise Price. The exercise price of the Common Stock under this Warrant shall be $0.10, subject to adjustment hereunder (the "Initial Exercise Price").

c)      Cashless Exercise. If at any time after one year from the date of issuance of this Warrant there is no effective Registration Statement registering, or no current prospectus available for, the resale of the Warrant Shares by the Holder, then this Warrant may also be exercised at such time by means of a "cashless exercise" in which the Holder shall be entitled to receive a certificate for the number of Warrant Shares equal to the quotient obtained by dividing [(A-B) (X)] by (A), where:

(A) = the VWAP on the Trading Day immediately preceding the date of such election;

(B) = the Exercise Price of this Warrant, as adjusted; and

(X) = the number of Warrant Shares issuable upon exercise of this Warrant in accordance with the terms of this Warrant by means of a cash exercise rather than a cashless exercise.

Notwithstanding anything herein to the contrary, on the Termination Date, this Warrant shall be automatically exercised via cashless exercise pursuant to this Section 2(c).

d)      Exercise Limitations; Holder's Restrictions. A Holder shall not have the right to exercise any portion of this Warrant, pursuant to Section 2(c) or otherwise, to the extent that after giving effect to such issuance after exercise, such Holder (together with such Holder's affiliates, and any other person or entity acting as a group together with such Holder or any of such Holder's affiliates), as set forth on the applicable Notice of Exercise, would beneficially own in excess of 4.99% of the number of shares of the Common Stock outstanding immediately after giving effect to such issuance. For purposes of the foregoing sentence, the number of shares of Common Stock beneficially owned by such Holder and its affiliates shall include the number of shares of Common Stock issuable upon exercise of this Warrant with respect to which the determination of such sentence is being made, but shall exclude the number of shares of Common Stock which would be issuable upon (A) exercise of the remaining, nonexercised portion of this Warrant beneficially owned by such Holder or any of its affiliates and (B) exercise or conversion of the unexercised or nonconverted portion of any other securities of the Company (including, without limitation, any other Debentures or Warrants) subject to a limitation on conversion or exercise analogous to the limitation contained herein beneficially owned by such Holder or any of its affiliates. Except as set forth in the preceding sentence, for purposes of this Section 2(d)(i), beneficial ownership shall be calculated in accordance with Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder, it being acknowledged by a Holder that the Company is not representing to such Holder that such calculation is in compliance with Section 13(d) of the Exchange Act and such Holder is solely responsible for any schedules required to be filed in accordance therewith. To the extent that the limitation contained in this Section 2(d) applies, the determination of whether this Warrant is exercisable (in relation to other securities owned by such Holder) and of which a portion of this Warrant is exercisable shall be in the sole discretion of a Holder, and the submission of a Notice of Exercise shall be deemed to be each Holder's determination of whether this Warrant is exercisable (in relation to other securities owned by such Holder) and of which portion of this Warrant is exercisable, in each case subject to such aggregate percentage limitation, and the Company shall have no obligation to verify or confirm the accuracy of such determination. In addition, a determination as to any group status as contemplated above shall be determined in accordance with Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder. For purposes of this Section 2(d), in determining the number of outstanding

2

shares of Common Stock, a Holder may rely on the number of outstanding shares of Common Stock as reflected in (x) the Company's most recent Form 10-QSB or Form 10-KSB, as the case may be, (y) a more recent public announcement by the Company or (z) any other notice by the Company or the Company's Transfer Agent setting forth the number of shares of Common Stock outstanding. Upon the written or oral request of a Holder, the Company shall within two Trading Days confirm orally and in writing to such Holder the number of shares of Common Stock then outstanding. In any case, the number of outstanding shares of Common Stock shall be determined after giving effect to the conversion or exercise of securities of the Company, including this Warrant, by such Holder or its affiliates since the date as of which such number of outstanding shares of Common Stock was reported. The provisions of this Section 2(d) may be waived by such Holder, at the election of such Holder, upon not less than 61 days' prior notice to the Company, and the provisions of this Section 2(d) shall continue to apply until such 61st day (or such later date, as determined by such Holder, as may be specified in such notice of waiver). The provisions of this paragraph shall be implemented in a manner otherwise than in strict conformity with the terms of this Section 2(d) to correct this paragraph (or any portion hereof) which may be defective or inconsistent with the intended 4.99% beneficial ownership limitation herein contained or to make changes or supplements necessary or desirable to properly give effect to such 4.99% limitation. The limitations contained in this paragraph shall apply to a successor holder of this Warrant. The holders of Common Stock of the Company shall be third party beneficiaries of this Section 2(d) and the Company may not waive this Section 2(d) without the consent of holders of a majority of its Common Stock.

  e)      Mechanics of Exercise.

         i.      Authorization of Warrant Shares.  The Company covenants that all Warrant Shares which may be issued upon the exercise of the purchase rights represented by this Warrant will, upon exercise of the purchase rights represented by this Warrant, be duly authorized, validly issued, fully paid and nonassessable and free from all taxes, liens and charges in respect of the issue thereof (other than taxes in respect of any transfer occurring contemporaneously with such issue).

         ii.      Delivery of Certificates Upon Exercise.  Certificates for shares purchased hereunder shall be transmitted by the transfer agent of the Company to the Holder by crediting the account of the Holder's prime broker with the Depository Trust Company through its Deposit Withdrawal Agent Commission ("DWAC") system if the Company is a participant in such system, and otherwise by physical delivery to the address specified by the Holder in the Notice of Exercise within 3 Trading Days from the delivery to the Company of the Notice of Exercise Form, surrender of this Warrant (if required) and payment of the aggregate Exercise Price as set forth above ("Warrant Share Delivery Date").  This Warrant shall be deemed to have been exercised on the date the Exercise Price is received by the Company.  The Warrant Shares shall be deemed to have been issued, and Holder or any other person so designated to be named therein shall be deemed to have become a holder of record of such shares for all purposes, as of the date the Warrant has been exercised by payment to the Company of the Exercise Price and all taxes required to be paid by the Holder, if any, pursuant to Section 2(e)(vii) prior to the issuance of such shares, have been paid.

         iii.      Delivery of New Warrants Upon Exercise.  If this Warrant shall have been exercised in part, the Company shall, at the request of a Holder and upon surrender of this Warrant certificate, at the time of delivery of the certificate or certificates representing Warrant Shares, deliver to Holder a new Warrant evidencing the rights of Holder to purchase the unpurchased Warrant Shares called for by this Warrant, which new Warrant shall in all other respects be identical with this Warrant.

         iv.      Rescission Rights.  If the Company fails to cause its transfer agent to transmit to the Holder a certificate or certificates representing the Warrant Shares

3

pursuant to this Section 2(e)(iv) by the Warrant Share Delivery Date, then the Holder will have the right to rescind such exercise.

      v.     <u>Compensation for Buy-In on Failure to Timely Deliver Certificates Upon Exercise</u>.  In addition to any other rights available to the Holder, if the Company fails to cause its transfer agent to transmit to the Holder a certificate or certificates representing the Warrant Shares pursuant to an exercise on or before the Warrant Share Delivery Date, and if after such date the Holder is required by its broker to purchase (in an open market transaction or otherwise) shares of Common Stock to deliver in satisfaction of a sale by the Holder of the Warrant Shares which the Holder anticipated receiving upon such exercise (a "<u>Buy-In</u>"), then the Company shall (1) pay in cash to the Holder the amount by which (x) the Holder's total purchase price (including brokerage commissions, if any) for the shares of Common Stock so purchased exceeds (y) the amount obtained by multiplying (A) the number of Warrant Shares that the Company was required to deliver to the Holder in connection with the exercise at issue times (B) the price at which the sell order giving rise to such purchase obligation was executed, and (2) at the option of the Holder, either reinstate the portion of the Warrant and equivalent number of Warrant Shares for which such exercise was not honored or deliver to the Holder the number of shares of Common Stock that would have been issued had the Company timely complied with its exercise and delivery obligations hereunder.  For example, if the Holder purchases Common Stock having a total purchase price of $11,000 to cover a Buy-In with respect to an attempted exercise of shares of Common Stock with an aggregate sale price giving rise to such purchase obligation of $10,000, under clause (1) of the immediately preceding sentence the Company shall be required to pay the Holder $1,000.  The Holder shall provide the Company written notice indicating the amounts payable to the Holder in respect of the Buy-In, together with applicable confirmations and other evidence reasonably requested by the Company.  Nothing herein shall limit a Holder's right to pursue any other remedies available to it hereunder, at law or in equity including, without limitation, a decree of specific performance and/or injunctive relief with respect to the Company's failure to timely deliver certificates representing shares of Common Stock upon exercise of the Warrant as required pursuant to the terms hereof.

      vi.     <u>No Fractional Shares or Scrip</u>.  No fractional shares or scrip representing fractional shares shall be issued upon the exercise of this Warrant.  As to any fraction of a share which Holder would otherwise be entitled to purchase upon such exercise, the Company shall pay a cash adjustment in respect of such final fraction in an amount equal to such fraction multiplied by the Exercise Price.

      vii.     <u>Charges, Taxes and Expenses</u>.  Issuance of certificates for Warrant Shares shall be made without charge to the Holder for any issue or transfer tax or other incidental expense in respect of the issuance of such certificate, all of which taxes and expenses shall be paid by the Company, and such certificates shall be issued in the name of the Holder or in such name or names as may be directed by the Holder; <u>provided, however</u>, that in the event certificates for Warrant Shares are to be issued in a name other than the name of the Holder, this Warrant when surrendered for exercise shall be accompanied by the Assignment Form attached hereto duly executed by the Holder; and the Company may require, as a condition thereto, the payment of a sum sufficient to reimburse it for any transfer tax incidental thereto.

      viii.     <u>Closing of Books</u>.  The Company will not close its stockholder books or records in any manner which prevents the timely exercise of this Warrant, pursuant to the terms hereof.

<u>Section 3.</u>        <u>Certain Adjustments</u>.

4

a)       Stock Dividends and Splits. If the Company, at any time while this Warrant is outstanding: (A) pays a stock dividend or otherwise make a distribution or distributions on shares of its Common Stock or any other equity or equity equivalent securities payable in shares of Common Stock (which, for avoidance of doubt, shall not include any shares of Common Stock issued by the Company pursuant to this Warrant), (B) subdivides outstanding shares of Common Stock into a larger number of shares, (C) combines (including by way of reverse stock split) outstanding shares of Common Stock into a smaller number of shares, or (D) issues by reclassification of shares of the Common Stock any shares of capital stock of the Company, then in each case the Exercise Price shall be multiplied by a fraction of which the numerator shall be the number of shares of Common Stock (excluding treasury shares, if any) outstanding immediately before such event and of which the denominator shall be the number of shares of Common Stock outstanding immediately after such event and the number of shares issuable upon exercise of this Warrant shall be proportionately adjusted. Any adjustment made pursuant to this Section 3(a) shall become effective immediately after the record date for the determination of stockholders entitled to receive such dividend or distribution and shall become effective immediately after the effective date in the case of a subdivision, combination or re-classification.

b)       Subsequent Equity Sales. If the Company or any Subsidiary thereof, as applicable, at any time while this Warrant is outstanding, shall offer, sell, grant any option to purchase or offer, sell or grant any right to reprice its securities, or otherwise dispose of or issue (or announce any offer, sale, grant or any option to purchase or other disposition) any Common Stock or Common Stock Equivalents entitling any Person to acquire shares of Common Stock, at an effective price per share less than the then Exercise Price (such lower price, the "Base Share Price" and such issuances collectively, a "Dilutive Issuance"), as adjusted hereunder (if the holder of the Common Stock or Common Stock Equivalents so issued shall at any time, whether by operation of purchase price adjustments, reset provisions, floating conversion, exercise or exchange prices or otherwise, or due to warrants, options or rights per share which is issued in connection with such issuance, be entitled to receive shares of Common Stock at an effective price per share which is less than the Exercise Price, such issuance shall be deemed to have occurred for less than the Exercise Price on such date of the Dilutive Issuance), then the Exercise Price shall be reduced and only reduced to equal the Base Share Price and the number of Warrant Shares issuable hereunder shall be increased such that the aggregate Exercise Price payable hereunder, after taking into account the decrease in the Exercise Price, shall be equal to the aggregate Exercise Price prior to such adjustment. Such adjustment shall be made whenever such Common Stock or Common Stock Equivalents are issued. Notwithstanding the foregoing, no adjustments shall be made, paid or issued under this Section 3(b) in respect of an Exempt Issuance. The Company shall notify the Holder in writing, no later than the Trading Day following the issuance of any Common Stock or Common Stock Equivalents subject to this section, indicating therein the applicable issuance price, or of applicable reset price, exchange price, conversion price and other pricing terms (such notice the "Dilutive Issuance Notice"). For purposes of clarification, whether or not the Company provides a Dilutive Issuance Notice pursuant to this Section 3(b), upon the occurrence of any Dilutive Issuance, after the date of such Dilutive Issuance the Holder is entitled to receive a number of Warrant Shares based upon the Base Share Price regardless of whether the Holder accurately refers to the Base Share Price in the Notice of Exercise.

c)       Pro Rata Distributions. If the Company, at any time prior to the Termination Date, shall distribute to all holders of Common Stock (and not to Holders of the Warrants) evidences of its indebtedness or assets (including cash and cash dividends) or rights or warrants to subscribe for or purchase any security other than the Common Stock (which shall be subject to Section 3(b)), then in each such case the Exercise Price shall be adjusted by multiplying the Exercise Price in effect immediately prior to the record date fixed for determination of stockholders entitled to receive such distribution by a fraction of which the denominator shall be the VWAP determined as of the record date mentioned above, and of which the numerator shall be such VWAP on such record date less the then per share fair market value at such record date of the portion of such assets or evidence of indebtedness so distributed applicable to one outstanding share of the Common Stock as determined by the Board of Directors in good faith. In either case the adjustments shall be described in a statement provided to the Holder of the portion of assets or evidences of indebtedness so distributed or such subscription rights applicable to one share of Common Stock. Such adjustment shall be made whenever any such distribution is made and shall become effective immediately after the record date mentioned above.

5

d)      Fundamental Transaction. If, at any time while this Warrant is outstanding, (A) the Company effects any merger or consolidation of the Company with or into another Person, (B) the Company effects any sale of all or substantially all of its assets in one or a series of related transactions, (C) any tender offer or exchange offer (whether by the Company or another Person) is completed pursuant to which holders of Common Stock are permitted to tender or exchange their shares for other securities, cash or property, or (D) the Company effects any reclassification of the Common Stock or any compulsory share exchange pursuant to which the Common Stock is effectively converted into or exchanged for other securities, cash or property (in any such case, a "Fundamental Transaction"), then, upon any subsequent exercise of this Warrant, the Holder shall have the right to receive, for each Warrant Share that would have been issuable upon such exercise immediately prior to the occurrence of such Fundamental Transaction, at the option of the Holder, (a) upon exercise of this Warrant, the number of shares of Common Stock of the successor or acquiring corporation or of the Company, if it is the surviving corporation, and any additional consideration (the "Alternate Consideration") receivable upon or as a result of such reorganization, reclassification, merger, consolidation or disposition of assets by a Holder of the number of shares of Common Stock for which this Warrant is exercisable immediately prior to such event or (b) if the Company is acquired in an all cash transaction, cash equal to the value of this Warrant as determined in accordance with the Black-Scholes option pricing formula. For purposes of any such exercise, the determination of the Exercise Price shall be appropriately adjusted to apply to such Alternate Consideration based on the amount of Alternate Consideration issuable in respect of one share of Common Stock in such Fundamental Transaction, and the Company shall apportion the Exercise Price among the Alternate Consideration in a reasonable manner reflecting the relative value of any different components of the Alternate Consideration. If holders of Common Stock are given any choice as to the securities, cash or property to be received in a Fundamental Transaction, then the Holder shall be given the same choice as to the Alternate Consideration it receives upon any exercise of this Warrant following such Fundamental Transaction. To the extent necessary to effectuate the foregoing provisions, any successor to the Company or surviving entity in such Fundamental Transaction shall issue to the Holder a new warrant consistent with the foregoing provisions and evidencing the Holder's right to exercise such warrant into Alternate Consideration. The terms of any agreement pursuant to which a Fundamental Transaction is effected shall include terms requiring any such successor or surviving entity to comply with the provisions of this Section 3(d) and insuring that this Warrant (or any such replacement security) will be similarly adjusted upon any subsequent transaction analogous to a Fundamental Transaction.

e)      Calculations. All calculations under this Section 3 shall be made to the nearest cent or the nearest 1/100th of a share, as the case may be. For purposes of this Section 3, the number of shares of Common Stock deemed to be issued and outstanding as of a given date shall be the sum of the number of shares of Common Stock (excluding treasury shares, if any) issued and outstanding.

f)      Voluntary Adjustment By Company. The Company may at any time during the term of this Warrant reduce the then current Exercise Price to any amount and for any period of time deemed appropriate by the Board of Directors of the Company.

g)      Notice to Holders.

i.      Adjustment to Exercise Price. Whenever the Exercise Price is adjusted pursuant to this Section 3, the Company shall promptly mail to each Holder a notice setting forth the Exercise Price after such adjustment and setting forth a brief statement of the facts requiring such adjustment. If the Company issues a variable rate security, despite the prohibition thereon in the Purchase Agreement, the Company shall be deemed to have issued Common Stock or Common Stock Equivalents at the lowest possible conversion or exercise price at which such securities may be converted or exercised in the case of a Variable Rate Transaction (as defined in the Purchase Agreement).

ii.     Notice to Allow Exercise by Holder. If (A) the Company shall declare a dividend (or any other distribution) on the Common Stock; (B) the Company shall declare a special nonrecurring cash dividend on or a redemption of the Common Stock; (C) the Company shall authorize the granting to all holders of the Common Stock rights

or warrants to subscribe for or purchase any shares of capital stock of any class or of any rights; (D) the approval of any stockholders of the Company shall be required in connection with any reclassification of the Common Stock, any consolidation or merger to which the Company is a party, any sale or transfer of all or substantially all of the assets of the Company, of any compulsory share exchange whereby the Common Stock is converted into other securities, cash or property; (E) the Company shall authorize the voluntary or involuntary dissolution, liquidation or winding up of the affairs of the Company; then, in each case, the Company shall cause to be mailed to the Holder at its last address as it shall appear upon the Warrant Register of the Company, at least 20 calendar days prior to the applicable record or effective date hereinafter specified, a notice stating (x) the date on which a record is to be taken for the purpose of such dividend, distribution, redemption, rights or warrants, or if a record is not to be taken, the date as of which the holders of the Common Stock of record to be entitled to such dividend, distributions, redemption, rights or warrants are to be determined or (y) the date on which such reclassification, consolidation, merger, sale, transfer or share exchange is expected to become effective or close, and the date as of which it is expected that holders of the Common Stock of record shall be entitled to exchange their shares of the Common Stock for securities, cash or other property deliverable upon such reclassification, consolidation, merger, sale, transfer or share exchange; provided, that the failure to mail such notice or any defect therein or in the mailing thereof shall not affect the validity of the corporate action required to be specified in such notice. The Holder is entitled to exercise this Warrant during the 20-day period commencing on the date of such notice to the effective date of the event triggering such notice.

Section 4.        Transfer of Warrant.

a)        Transferability. Subject to compliance with any applicable securities laws and the conditions set forth in Sections 5(a) and 4(d) hereof and to the provisions of Section 4.1 of the Purchase Agreement, this Warrant and all rights hereunder are transferable, in whole or in part, upon surrender of this Warrant at the principal office of the Company, together with a written assignment of this Warrant substantially in the form attached hereto duly executed by the Holder or its agent or attorney and funds sufficient to pay any transfer taxes payable upon the making of such transfer. Upon such surrender and, if required, such payment, the Company shall execute and deliver a new Warrant or Warrants in the name of the assignee or assignees and in the denomination or denominations specified in such instrument of assignment, and shall issue to the assignor a new Warrant evidencing the portion of this Warrant not so assigned, and this Warrant shall promptly be cancelled. A Warrant, if properly assigned, may be exercised by a new holder for the purchase of Warrant Shares without having a new Warrant issued.

b)        New Warrants. This Warrant may be divided or combined with other Warrants upon presentation hereof at the aforesaid office of the Company, together with a written notice specifying the names and denominations in which new Warrants are to be issued, signed by the Holder or its agent or attorney. Subject to compliance with Section 4(a), as to any transfer which may be involved in such division or combination, the Company shall execute and deliver a new Warrant or Warrants in exchange for the Warrant or Warrants to be divided or combined in accordance with such notice.

c)        Warrant Register. The Company shall register this Warrant, upon records to be maintained by the Company for that purpose (the "Warrant Register"), in the name of the record Holder hereof from time to time. The Company may deem and treat the registered Holder of this Warrant as the absolute owner hereof for the purpose of any exercise hereof or any distribution to the Holder, and for all other purposes, absent actual notice to the contrary.

d)        Transfer Restrictions. If, at the time of the surrender of this Warrant in connection with any transfer of this Warrant, the transfer of this Warrant shall not be registered pursuant to an effective registration statement under the Securities Act and under applicable state securities or blue sky laws, the Company may require, as a condition of allowing such transfer (i) that the Holder or transferee of this Warrant, as the case may be, furnish to the Company a written opinion of counsel (which opinion shall be

7

in form, substance and scope customary for opinions of counsel in comparable transactions) to the effect that such transfer may be made without registration under the Securities Act and under applicable state securities or blue sky laws, (ii) that the holder or transferee execute and deliver to the Company an investment letter in form and substance acceptable to the Company and (iii) that the transferee be an "accredited investor" as defined in Rule 501(a)(1), (a)(2), (a)(3), (a)(7), or (a)(8) promulgated under the Securities Act or a qualified institutional buyer as defined in Rule 144A(a) under the Securities Act.

Section 5.   Miscellaneous.

a)   Title to Warrant. Prior to the Termination Date and subject to compliance with applicable laws and Section 4 of this Warrant, this Warrant and all rights hereunder are transferable, in whole or in part, at the office or agency of the Company by the Holder in person or by duly authorized attorney, upon surrender of this Warrant together with the Assignment Form annexed hereto properly endorsed. The transferee shall sign an investment letter in form and substance reasonably satisfactory to the Company.

b)   No Rights as Shareholder Until Exercise. This Warrant does not entitle the Holder to any voting rights or other rights as a shareholder of the Company prior to the exercise hereof. Upon the surrender of this Warrant and the payment of the aggregate Exercise Price (or by means of a cashless exercise), the Warrant Shares so purchased shall be and be deemed to be issued to such Holder as the record owner of such shares as of the close of business on the later of the date of such surrender or payment.

c)   Loss, Theft, Destruction or Mutilation of Warrant. The Company covenants that upon receipt by the Company of evidence reasonably satisfactory to it of the loss, theft, destruction or mutilation of this Warrant or any stock certificate relating to the Warrant Shares, and in case of loss, theft or destruction, of indemnity or security reasonably satisfactory to it (which, in the case of the Warrant, shall not include the posting of any bond), and upon surrender and cancellation of such Warrant or stock certificate, if mutilated, the Company will make and deliver a new Warrant or stock certificate of like tenor and dated as of such cancellation, in lieu of such Warrant or stock certificate.

d)   Saturdays, Sundays, Holidays, etc. If the last or appointed day for the taking of any action or the expiration of any right required or granted herein shall be a Saturday, Sunday or a legal holiday, then such action may be taken or such right may be exercised on the next succeeding day not a Saturday, Sunday or legal holiday.

e)   Authorized Shares.

The Company covenants that during the period the Warrant is outstanding, it will reserve from its authorized and unissued Common Stock a sufficient number of shares to provide for the issuance of the Warrant Shares upon the exercise of any purchase rights under this Warrant. The Company further covenants that its issuance of this Warrant shall constitute full authority to its officers who are charged with the duty of executing stock certificates to execute and issue the necessary certificates for the Warrant Shares upon the exercise of the purchase rights under this Warrant. The Company will take all such reasonable action as may be necessary to assure that such Warrant Shares may be issued as provided herein without violation of any applicable law or regulation, or of any requirements of the Trading Market upon which the Common Stock may be listed.

Except and to the extent as waived or consented to by the Holder, the Company shall not by any action, including, without limitation, amending its certificate of incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Warrant, but will at all times in good faith assist in the carrying out of all such terms and in the taking of all such actions as may be necessary or appropriate to protect the rights of Holder as set forth in this Warrant against impairment. Without limiting the generality of the

8

foregoing, the Company will (a) not increase the par value of any Warrant Shares above the amount payable therefor upon such exercise immediately prior to such increase in par value, (b) take all such action as may be necessary or appropriate in order that the Company may validly and legally issue fully paid and nonassessable Warrant Shares upon the exercise of this Warrant, and (c) use commercially reasonable efforts to obtain all such authorizations, exemptions or consents from any public regulatory body having jurisdiction thereof as may be necessary to enable the Company to perform its obligations under this Warrant.

Before taking any action which would result in an adjustment in the number of Warrant Shares for which this Warrant is exercisable or in the Exercise Price, the Company shall obtain all such authorizations or exemptions thereof, or consents thereto, as may be necessary from any public regulatory body or bodies having jurisdiction thereof.

f)    Jurisdiction. All questions concerning the construction, validity, enforcement and interpretation of this Warrant shall be determined in accordance with the provisions of the Purchase Agreement.

g)    Restrictions. The Holder acknowledges that the Warrant Shares acquired upon the exercise of this Warrant, if not registered, will have restrictions upon resale imposed by state and federal securities laws.

h)    Nonwaiver and Expenses. No course of dealing or any delay or failure to exercise any right hereunder on the part of Holder shall operate as a waiver of such right or otherwise prejudice Holder's rights, powers or remedies, notwithstanding the fact that all rights hereunder terminate on the Termination Date. If the Company willfully and knowingly fails to comply with any provision of this Warrant, which results in any material damages to the Holder, the Company shall pay to Holder such amounts as shall be sufficient to cover any costs and expenses including, but not limited to, reasonable attorneys' fees, including those of appellate proceedings, incurred by Holder in collecting any amounts due pursuant hereto or in otherwise enforcing any of its rights, powers or remedies hereunder.

i)    Notices. Any notice, request or other document required or permitted to be given or delivered to the Holder by the Company shall be delivered in accordance with the notice provisions of the Purchase Agreement.

j)    Limitation of Liability. No provision hereof, in the absence of any affirmative action by Holder to exercise this Warrant or purchase Warrant Shares, and no enumeration herein of the rights or privileges of Holder, shall give rise to any liability of Holder for the purchase price of any Common Stock or as a stockholder of the Company, whether such liability is asserted by the Company or by creditors of the Company.

k)    Remedies. Holder, in addition to being entitled to exercise all rights granted by law, including recovery of damages, will be entitled to specific performance of its rights under this Warrant. The Company agrees that monetary damages would not be adequate compensation for any loss incurred by reason of a breach by it of the provisions of this Warrant and hereby agrees to waive the defense in any action for specific performance that a remedy at law would be adequate.

l)    Successors and Assigns. Subject to applicable securities laws, this Warrant and the rights and obligations evidenced hereby shall inure to the benefit of and be binding upon the successors of the Company and the successors and permitted assigns of Holder. The provisions of this Warrant are intended to be for the benefit of all Holders from time to time of this Warrant and shall be enforceable by any such Holder or holder of Warrant Shares.

m)    Amendment. This Warrant may be modified or amended or the provisions hereof waived with the written consent of the Company and the Holder.

9

n)      Severability.  Wherever possible, each provision of this Warrant shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Warrant shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Warrant.

o)      Headings.  The headings used in this Warrant are for the convenience of reference only and shall not, for any purpose, be deemed a part of this Warrant.

*********************

10

IN WITNESS WHEREOF, the Company has caused this Warrant to be executed by its officer thereunto duly authorized effective as of the Original Issue Date set forth above.

**ADVANCED CELL TECHNOLOGY, INC/**

By:

Name: Gary Rabin
Title: Chairman and CEO

11

## NOTICE OF EXERCISE

TO:               ADVANCED CELL TECHNOLOGY, INC.

(1) The undersigned hereby elects to purchase _____ Warrant Shares of the Company pursuant to the terms of the attached Warrant (only if exercised in full), and tenders herewith payment of the exercise price in full, together with all applicable transfer taxes, if any.

(2) Payment shall take the form of (check applicable box):

☐ in lawful money of the United States; or

☐ the cancellation of such number of Warrant Shares as is necessary, in accordance with the formula set forth in subsection 2(c), to exercise this Warrant with respect to the maximum number of Warrant Shares purchasable pursuant to the cashless exercise procedure set forth in subsection 2(c).

(3) Please issue a certificate or certificates representing said Warrant Shares in the name of the undersigned or in such other name as is specified below:

_____

The Warrant Shares shall be delivered to the following:

_____

_____

_____

(4) Accredited Investor. The undersigned is an "accredited investor" as defined in Regulation D promulgated under the Securities Act of 1933, as amended.

[SIGNATURE OF HOLDER]

Name of Investing Entity: _____
*Signature of Authorized Signatory of Investing Entity*: _____
Name of Authorized Signatory: _____
Title of Authorized Signatory: _____
Date:_____

12

Black Mountain Equities, Inc.

**NOTICE OF EXERCISE**

TO:   ADVANCED CELL TECHNOLOGY INC.

(1) The undersigned hereby elects to purchase *16,000,000* Warrant Shares of the Company pursuant to the terms of the attached Warrant (only if exercised in full), and tenders herewith payment of the exercise price in full, together with all applicable transfer taxes, if any.

(2) Payment shall take the form of (check applicable box):

[ ] in lawful money of the United States; or

[✓] [if permitted] the cancellation of such number of Warrant Shares as is necessary, in accordance with the formula set forth in subsection 2(c), to exercise this Warrant with respect to the maximum number of Warrant Shares purchasable pursuant to the cashless exercise procedure set forth in subsection 2(c).

(3) Please issue a certificate or certificates representing said Warrant Shares in the name of the undersigned or in such other name as is specified below:

Black Mountain Equities, Inc.

The Warrant Shares shall be delivered to the following DWAC Account Number or by physical delivery of a certificate to: *18,000,000 Shares delivered to:*

Pennaluna & Company, Inc.
Account Name: Black Mountain Equities, Inc.
Account #: LTS-020273
DTC # 0226

(4)   Accredited Investor.   The undersigned is an "accredited investor" as defined in Regulation D promulgated under the Securities Act of 1933, as amended.

[SIGNATURE OF HOLDER]

Name of Investing Entity: Black Mountain Equities, Inc.
*Signature of Authorized Signatory of Investing Entity:*
Name of Authorized Signatory: Adam Baker
Title of Authorized Signatory: President
Date: 8-31-11

Aggregate exercise value = 4,000,000 × .165 = $660,000

$660,000 / .03 (Exercise price) = 22,000,000

Total # shares to deliver = 18,000,000 = $$\frac{[(.165-.03) \times 22,000,000]}{.165}$$

# EXHIBIT F

8-K 1 v232624_8k.htm FORM 8-K

# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 8-K

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(D) OF THE**
**SECURITIES EXCHANGE ACT OF 1934**

Date of report (Date of earliest event reported):   **July 1, 2011**

# ADVANCED CELL TECHNOLOGY, INC.

(Exact name of registrant as specified in its charter)

| **Delaware** | **000-50295** | **87-0656515** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification Number) |

**33 LOCKE DRIVE, MARLBOROUGH, MASSACHUSETTS 01752**
(Address of principal executive offices, including zip code)

**(508)756-1212**
(Registrant's telephone number, including area code)

(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b)

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CAR 240.13e-4(c))

**Item 1.01 Entry into a Material Definitive Agreement.**

On August 9, 2011, Advanced Cell Technology Inc. (the "Company") entered into a settlement agreement and mutual release (the "Settlement Agreement") with Midsummer Investment, Ltd. and Midsummer Small Cap Master, Ltd. (collectively, "Midsummer").

Pursuant to the Settlement Agreement, upon tender by Midsummer to the Company of warrants held by Midsummer to purchase a total of 20,319,731 shares of the Company's common stock (the "Warrants"), and duly executed notices of exercise (deemed to occur upon execution of the Settlement Agreement), the Company, to settle errors involving warrant issuances to Midsummer, agreed to (i) deliver to Midsummer an aggregate of 36,000,000 shares of the Company's common stock (the "Current Shares"), as an exercise of the Warrants in respect of a partial exercise of Warrants, (ii) undertake to issue 30,585,774 additional shares of the Company's common stock (the "Future Shares"), as an exercise of the remainder of the Warrants within ten days of the date that the Company shall have sufficient authorized and unissued shares of Common Stock ("Authorized Share Increase") which are not otherwise reserved for issuance for other purposes to enable the Company to issue all of the Future Shares and (iii) issue 3,058,577 shares of the Company's common stock (the "Additional Future Shares") for every calendar month elapsed between the date of delivery of the Current Shares and the date following delivery of the Future Shares. The Company and Midsummer provided mutual general releases.

In connection with the foregoing, the Company relied on the exemption from registration provided by Section 4(2) of the Securities Act of 1933, as amended, for transactions not involving a public offering.

**Item 2.02. Results of Operations and Financial Condition**

On August 8, 2011, the Company issued a press release announced its financial results for the quarter ended June 30, 2011 and certain other information. A copy of the Company's press release announcing these financial results and certain other information is attached hereto as Exhibit 99.1.

In accordance with General Instruction B.2 of Form 8-K, the information in this Item 2.02 of Current Report on Form 8-K, including Exhibit 99.1, shall not be deemed to be "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to the liabilities of that section, and shall not be deemed to be incorporated by reference into any of the Company's filings under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, whether made before or after the date hereof and regardless of any general incorporation language in such filings, except to the extent expressly set forth by specific reference in such a filing.

**Item 3.02. Unregistered Sales of Equity Securities.**

See Items 1.01 and 5.02.

**Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

*Amended and Restated Employment Agreement between the Company and Gary H. Rabin*

Effective July 1, 2011, the Company entered into an amended and restated employment agreement with Gary H. Rabin (the "Rabin Agreement"), a director of the Company since December 2007 and the Company's interim Chief Executive Officer since December 2010. Pursuant to the Rabin Agreement, the parties agreed as follows:

- Mr. Rabin will serve as the Company's chief executive officer and chief financial officer for a term commencing on July 1, 2011 until December 31, 2013 (subject to earlier termination as provided therein).

- The Company will pay Mr. Rabin a base salary of $500,000 per year, through December 31, 2011, which amount shall increase at the end of each year of the Rabin Agreement, by an amount determined by the board, but by not less than 5% per year.

- The Company agreed to pay Mr. Rabin a retention bonus of $41,667 within 10 days of execution of the Rabin Agreement.

- The Company shall pay Mr. Rabin an annual incentive bonus, which will be calculated by reference to the 10-day volume weighted average price of the Company's common stock, as set forth therein.

- The Company shall pay Mr. Rabin a performance bonus in amount (not less than $100,000 per year) to be determined by the Compensation Committee of the Board of Directors.

- The Company agreed to issue to Mr. Rabin, upon execution of the Rabin Agreement, (i) 10,000,000 shares of common stock, (ii) an option to purchase 10,000,000 shares of common stock with an exercise price equal to fair market value on the date of grant, (iii) an option to purchase 5,000,000 shares of common stock with an exercise price of $0.30, and (iv) an option to purchase 5,000,000 shares of common stock with an exercise price of $0.45. The options will vest, and the shares will no longer be subject to the Company's right to repurchase for aggregate consideration of $1.00, in equal installments on the last day of each calendar quarter commencing on July 1, 2011 and ending on December 31, 2013.

- If Mr. Rabin's employment under the Rabin Agreement were to be terminated by the Company without cause (as defined therein), the Company will pay Mr. Rabin (in addition to unpaid base salary, performance bonus and incentive bonus to the date of termination), a lump sum equal to the aggregate installments of base salary in effect on the date of termination and otherwise payable in respect of the period commencing on the date immediately subsequent to the date of termination and ending on the earlier to occur of the first anniversary of such date and December 31, 2013.

### Amended and Restated Employment Agreement between the Company and Robert Lanza

Effective July 1, 2011, the Company entered into an amended and restated employment agreement with Robert Lanza (the "Lanza Agreement"), the Company's chief scientific officer since October 2007. Pursuant to the Lanza Agreement, the parties agreed as follows:

- Dr. Lanza will continue serve as the Company's chief scientific officer for a term commencing on July 1, 2011 until September 30, 2013 (subject to earlier termination as provided therein, and extension by mutual written agreement).

- The Company will pay Dr. Lanza a base salary of $440,000 per year, which amount shall increase at the end of each year of the Lanza Agreement, by an amount determined by the board, but by not less than 5% per year. The Company may also pay Dr. Lanza annual bonuses in in the Company's sole discretion.

- The Company agreed to issue to Dr. Lanza, upon execution of the Lanza Agreement, (i) 15,000,000 shares of common stock (of which 6,000,000 shares will vest on the date of grant, with the balance of 9,000,000 shares vesting in equal installments on the last day of each month commencing on January 31, 2012 and ending on September 30, 2013), (ii) an option to purchase 15,000,000 shares of common stock with an exercise price equal to the closing price on the date of execution (of which 6,000,000 options will vest on the date of grant, with the balance of 9,000,000 options vesting in equal installments on the last day of each month commencing on January 31, 2012 and ending on September 30, 2013).

- If Dr. Lanza's employment under the Lanza Agreement were to be terminated by the Company without cause (as defined therein), the Company will pay Dr. Lanza severance equal to one year base salary.

In connection with the foregoing, the Company relied upon the exemption from securities registration afforded by Section 4(2) of the Securities Act for transactions not involving a public offering.

**Item 9.01  Financial Statements and Exhibits.**

**Exhibit Number  Description of Exhibit**

| | |
|---|---|
| 10.1 | Settlement Agreement and Mutual Release, dated August 9, 2011, by and between the Company, Midsummer Investment, Ltd., and Midsummer Small Cap Master, Ltd. |
| 10.2 | Amended and Restated Employment Agreement, dated July 1, 2011, by and between the Company and Robert P. Lanza |
| 10.3 | Amended and Restated Employment Agreement, dated July 1, 2011, by and between the Company and Gary H. Rabin. |
| 99.1 | Press release, dated August 9, 2011 |

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, hereunto duly authorized.

**ADVANCED CELL TECHNOLOGY, INC.**

Dated: August 17, 2011

By: /s/ Gary H. Rabin

Gary H. Rabin
Chief Executive Officer

# EXHIBIT G

ADVANCED CELL TECHNOLOGY, INC. AND SUBSIDIARY
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unaudited)

## 1.    ORGANIZATIONAL MATTERS

### Organization and Nature of Business

Advanced Cell Technology, Inc. (the "Company") is a biotechnology company, incorporated in the state of Delaware, focused on developing and commercializing human embryonic and adult stem cell technology in the emerging fields of regenerative medicine. Principal activities to date have included obtaining financing, securing operating facilities, and conducting research and development. The Company has no therapeutic products currently available for sale and does not expect to have any therapeutic products commercially available for sale for a period of years, if at all. These factors indicate that the Company's ability to continue its research and development activities is dependent upon the ability of management to obtain additional financing as required.

## 2.    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

*Basis of Presentation* —The Company follows accounting standards set by the Financial Accounting Standards Board ("FASB"). The accompanying consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP"). References to GAAP issued by the FASB in these footnotes are to the FASB Accounting Standards Codification,™ sometimes referred to as the Codification or ASC.

*Principles of Consolidation* — The accounts of the Company and its wholly-owned subsidiary Mytogen, Inc. ("Mytogen") are included in the accompanying consolidated financial statements. All intercompany balances and transactions were eliminated in consolidation.

*Segment Reporting* —ASC 280, *"Segment Reporting"* requires use of the "management approach" model for segment reporting. The management approach model is based on the way a company's management organizes segments within the company for making operating decisions and assessing performance. The Company determined it has one operating segment. Disaggregation of the Company's operating results is impracticable, because the Company's research and development activities and its assets overlap, and management reviews its business as a single operating segment. Thus, discrete financial information is not available by more than one operating segment.

*Use of Estimates* — These consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States and, accordingly, require management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Specifically, the Company's management has estimated variables used to calculate the Black-Scholes option pricing model used to value derivative instruments as discussed below under "Fair Value Measurements". In addition, management has estimated the expected economic life and value of the Company's licensed technology, the Company's deferred tax asset and valuation allowance, share-based payments for compensation to employees, directors, consultants, lenders and investment banks, and the useful lives of the Company's fixed assets and its accounts receivable allowance. Actual results could differ from those estimates.

*Reclassifications* — Certain prior year financial statement balances have been reclassified to conform to the current year presentation.

*Cash and Cash Equivalents* — Cash equivalents are comprised of certain highly liquid investments with maturities of three months or less when purchased. The Company maintains its cash in bank deposit accounts, which at times, may exceed federally insured limits. The Company has not experienced any losses related to this concentration of risk. As of June 30, 2011 and December 31, 2010, the Company had deposits in excess of federally-insured limits totaling $15,614,324 and $15,399,150, respectively.

*Property and Equipment* — The Company records its property and equipment at historical cost. The Company expenses maintenance and repairs as incurred. Upon disposition of property and equipment, the gross cost and accumulated depreciation are written off and the difference between the proceeds and the net book value is recorded as a gain or loss on sale of assets. In the case of certain assets acquired under capital leases, the assets are recorded net of imputed interest, based upon the net present value of future payments. Assets under capital lease are pledged as collateral for the related lease.

The Company provides for depreciation over the assets' estimated useful lives as follows:

Machinery & equipment          4 years

# EXHIBIT H

*Cash Flows from Investing*

Cash used in investing activities during the six months ended June 30, 2011 and 2010 was $36,830 and $186,495, respectively. Our cash used in investing activities during the six months ended June 30, 2011 was attributed to the purchase of fixed assets for approximately $37,000.

*Cash Flows from Financing Activities*

Cash flows provided by financing activities during the six months ended June 30, 2011 and 2010 was $6,950,940 and $7,153,865, respectively. During the six months ended June 30, 2011, we received $4,000,000 from the issuance of 400 shares of Series C Preferred stock and $2,950,940 from the exercise of warrants.

We plan to fund our operations for the foreseeable future from the following sources:

- As of June 30, 2011, we have approximately $16,114,324 in cash.
- As of June 30, 2011, approximately $1,580,000 is available to us upon the sale of our Series A-1 preferred stock for a maximum placement commitment of $5 million.
- As of June 30, 2011, $17,000,000 is available to us upon the sale of our Series C preferred stock for a maximum placement commitment of $25,000,000.
- We continue to repay our debt financings in shares of common stock, enabling us to use our cash resources to fund our operations.

On a long term basis, we have no expectation of generating any meaningful revenues from our product candidates for a substantial period of time and will rely on raising funds in capital transactions to finance our research and development programs. Our future cash requirements will depend on many factors, including the pace and scope of our research and development programs, the costs involved in filing, prosecuting and enforcing patents, and other costs associated with commercializing our potential products. We intend to seek additional funding primarily through public or private financing transactions, and, to a lesser degree, new licensing or scientific collaborations, grants from governmental or other institutions, and other related transactions. If we are unable to raise additional funds, we will be forced to either scale back our business efforts or curtail our business activities entirely. We anticipate that our available cash and expected income will be sufficient to finance most of our current activities for the foreseeable future. We cannot assure you that public or private financing or grants will be available on acceptable terms, if at all. Several factors will affect our ability to raise additional funding, including, but not limited to, the volatility of our common stock.

49

# EXHIBIT I

### ADVANCED CELL TECHNOLOGY, INC. AND SUBSIDIARY
### CONSOLIDATED BALANCE SHEETS
### AS OF JUNE 30, 2011 AND DECEMBER 31, 2010

|  | June 30, 2011 | December 31, 2010 |
|---|---|---|
|  | (unaudited) |  |
| **ASSETS** |  |  |
| **CURRENT ASSETS:** |  |  |
| Cash and cash equivalents | $ 16,114,324 | $ 15,889,409 |
| Deferred royalty fees, current portion | 77,017 | 91,598 |
| Prepaid expenses | 344,497 | - |
| Total current assets | 16,535,838 | 15,981,007 |
| Property and equipment, net | 183,538 | 185,102 |
| Deferred royalty fees, less current portion | 263,870 | 295,089 |
| Deposits | 14,766 | 14,766 |
| Deferred issuance costs | 1,782,648 | 2,578,188 |
| **TOTAL ASSETS** | $ 18,780,660 | $ 19,054,152 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** |  |  |
| **CURRENT LIABILITIES:** |  |  |
| Accounts payable | $ 1,925,861 | $ 1,982,743 |
| Accrued expenses | 1,610,230 | 4,971,304 |
| Accrued settlement | - | 3,205,856 |
| Deferred revenue, current portion | 310,412 | 506,418 |
| 2009 Convertible promissory notes, current portion, net of discounts of $0 and $19,229, respectively | - | 132,680 |
| Embedded conversion option liabilities, current portion | - | 537,249 |
| Deferred joint venture obligations, current portion | 1,853 | 6,870 |
| Total current liabilities | 3,848,356 | 11,343,120 |
| Convertible promissory notes, less current portion, net of discounts of $222,095 and $285,005, respectively | 65,690 | 2,780 |
| Embedded conversion option liabilities, less current portion | 598,229 | 482,686 |
| Warrant and option derivative liabilities | 16,931,286 | 27,307,218 |
| Deferred revenue, less current portion | 2,187,627 | 2,298,997 |
| Total liabilities | 23,631,188 | 41,434,801 |
| Series A-1 redeemable preferred stock, $0.001 par value; 50,000,000 shares authorized, 113 and 113 shares issued and outstanding; aggregate liquidation value, net of discounts: $1,408,958 and $1,349,657, respectively | 1,348,642 | 1,272,441 |
| Commitments and contingencies |  |  |
| **STOCKHOLDERS' DEFICIT:** |  |  |
| Preferred stock, Series B; $0.001 par value; 50,000,000 shares authorized, 1,000 shares issued and outstanding | 1 | 1 |
| Preferred stock, Series C; $0.001 par value; 50,000,000 shares authorized, 800 and 400 shares issued and outstanding at June 30, 2011 and December 31, 2010, respectively | 1 | - |
| Common stock, $0.001 par value; 1,750,000,000 shares authorized, 1,588,670,748 and 1,439,826,362 shares issued and outstanding at June 30, 2011 and December 31, 2010, respectively | 1,588,671 | 1,439,826 |
| Additional paid-in capital | 200,370,360 | 166,033,976 |
| Promissory notes receivable and accrued interest, net of discount of $4,282,786 and $3,322,630, respectively | (18,978,857) | (10,177,370) |
| Accumulated deficit | (189,179,346) | (180,949,523) |

| | | |
|---|---|---|
| Total stockholders' deficit | (6,199,170) | (23,653,090) |
| **TOTAL LIABILITIES AND STOCKHOLDERS' DEFICIT** | $ 18,780,660 | $ 19,054,152 |

The accompanying notes are an integral part of these consolidated financial statements.

F-1

**ADVANCED CELL TECHNOLOGY, INC. AND SUBSIDIARY**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**FOR THE THREE AND SIX MONTHS ENDED JUNE 30, 2011 AND 2010**
**(UNAUDITED)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2011 | 2010 | 2011 | 2010 |
| Revenue (License fees and royalties) | $ 153,688 | $ 205,158 | $ 307,376 | $ 410,316 |
| Cost of Revenue | 281,500 | 66,650 | 304,400 | 133,300 |
| Gross profit (loss) | (127,812) | 138,508 | 2,976 | 277,016 |
| **Operating expenses:** | | | | |
| Research and development | 1,532,271 | 1,484,141 | 3,007,044 | 5,379,722 |
| General and administrative expenses | 1,951,728 | 1,349,219 | 5,149,254 | 12,567,462 |
| Change in estimate of accrued liabilities | - | (1,569,966) | - | (1,569,966) |
| Loss on settlement of litigation | - | - | 294,144 | - |
| Total operating expenses | 3,483,999 | 1,263,394 | 8,450,442 | 16,377,218 |
| Loss from operations | (3,611,811) | (1,124,886) | (8,447,466) | (16,100,202) |
| **Non-operating income (expense):** | | | | |
| Interest income | 10,765 | 7,936 | 22,549 | 10,979 |
| Interest expense and late fees | (272,171) | (2,429,519) | (953,881) | (5,782,293) |
| Gain on forgiveness of debt | - | 27,973 | - | 27,973 |
| Finance cost | (245,734) | (493,110) | (2,871,609) | (1,602,400) |
| Adjustments to fair value of derivatives | (701,198) | 6,942,005 | 4,088,221 | 8,526,709 |
| Total non-operating income (expense) | (1,208,338) | 4,055,285 | 285,280 | 1,180,968 |
| Loss before income tax | (4,820,149) | 2,930,399 | (8,162,186) | (14,919,234) |
| Income tax | - | - | - | - |
| Net loss | $ (4,820,149) | $ 2,930,399 | $ (8,162,186) | $ (14,919,234) |
| **Weighted average shares outstanding :** | | | | |
| Basic and diluted | 1,543,519,167 | 882,666,998 | 1,510,945,682 | 708,524,844 |
| **Loss per share:** | | | | |
| Basic and diluted | $ (0.00) | $ 0.00 | $ (0.01) | $ (0.02) |

The accompanying notes are an integral part of these consolidated financial statements.

F-2

# EXHIBIT J

1173339-1

*We have a history of operating losses and we may not achieve future revenues or operating profits.*

We have generated modest revenue to date from our operations. Historically we have had net operating losses each year since our inception. As of June 30, 2011, we have an accumulated deficit of $189,179,346 and a stockholders' deficit of $6,199,170. We incurred a net loss of $_8,162,186 for the six months ended June 30, 2011. We incurred a net loss of $54,373,332 and $36,758,208 for the years ended December 31, 2010 and 2009, respectively.   We have limited current potential sources of income from licensing fees and the Company does not generate significant revenue outside of licensing non-core technologies. Additionally, even if we are able to commercialize our technologies or any products or services related to our technologies it is not certain that they will result in revenue or profitability.

Prospectus Filed 8/29/11